# IN THE COURT OF APPEALS OF IOWA

No. 19-0372
Filed May 1, 2019

**IN THE INTEREST OF J.W., K.W., and G.J.,**
**Minor Children,**

**K.W., Mother,**
    Appellant,

**G.J., Father of G.J.,**
    Appellant.

_____

Appeal from the Iowa District Court for Johnson County, Jason A. Burns, District Associate Judge.

Parents separately appeal the termination of their parental rights to their child, and the mother additionally appeals the termination of her parental rights to two of her other children. **AFFIRMED ON BOTH APPEALS.**

Sara Strain Linder of Bray & Klockau, P.L.C., Iowa City, for appellant mother.

Ellen R. Ramsey-Kacena, Cedar Rapids, for appellant father of G.J.

Thomas J. Miller, Attorney General, and Anna T. Stoeffler, Assistant Attorney General, for appellee State.

Anthony Haughton of Linn County Advocate, Inc., Cedar Rapids, guardian ad litem for minor children.

Considered by Vaitheswaran, P.J., Tabor, J., and Scott, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2019).

**SCOTT, Senior Judge.**

Parents separately appeal the termination of their parental rights to their child, G.J., born in 2015, and the mother additionally appeals the termination of her parental rights to two of her other children, J.W. and K.W., born in 2009 and 2011.[1] The father argues the Iowa Department of Human Services (DHS) failed to make reasonable efforts to facilitate reunification and termination is not in G.J.'s best interests because a guardianship could have been established in the paternal grandmother. The mother challenges the sufficiency of the evidence underlying the grounds for termination cited by the juvenile court, argues termination is not in the children's best interests due to the parent-child bond, and maintains she should have been granted additional time to work toward reunification.

## I.      Background Facts and Proceedings

The parents lived in Illinois when the youngest child was born in 2015. A few months later, the mother and children moved to Iowa. The father stayed in Illinois, living with his mother; he has never lived on his own and has always relied on his mother for stable housing. Thereafter, contact between the father and G.J. was infrequent. The mother has a history of involvement with child-welfare services in Illinois and suffers from depression. Both parents have histories of criminal activity.

The children came to the attention of DHS in August 2017 upon information that the mother left the youngest child without proper supervision for at least ninety minutes. A subsequent child-abuse assessment was founded for denial of critical

---

[1] The parental rights of the latter two children's respective fathers were also terminated. They do not appeal.

care.  The next day, DHS learned the mother intended to turn herself in on criminal charges and leave the children with their maternal grandmother.  DHS advised the maternal grandmother was an inappropriate caregiver and the children should not be left with her.  The mother agreed she would not leave the children with the maternal grandmother.  Three days later, however, DHS learned the mother left the children with the maternal grandmother.  The children were removed from the mother's care and placed in DHS custody on August 28.  The mother left the children with the maternal grandmother or allowed them to be around her on a number of occasions throughout the life of the case despite being told the maternal grandmother was an inappropriate person to be around the children.

Both parents appeared at the September 1 removal hearing, during which all parties stipulated to continued removal.[2]  The court's removal order noted the "father supports a return of the children to their mother if possible; but if that is not possible, he requests the children be placed with him [and] specifically requests an expedited" home study pursuant to the Interstate Compact on the Placement of Children (ICPC). The court authorized DHS to conduct an ICPC study as to the father's home but did not expressly order that one be conducted.  The DHS worker testified that the mother was doing well in progressing with case-plan goals at this time.   Ultimately, a trial home placement of the children with the mother commenced on September 7.

---

[2] The only transcript contained in the record on appeal is for the termination hearing.  We are required to discern the details of the remaining hearings from the juvenile court orders following those hearings.

An uncontested adjudication hearing was held on September 27. The order of adjudication mandated that "upon request of [the father], . . . [DHS] establish a visit plan between [the father] and his child. The [DHS] is given discretion to determine the frequency, duration, and level of supervision as deemed appropriate." The court also ordered that a social-history report be completed. Both parents were provided social-history questionnaires, but only the mother completed and returned it to DHS. The social-history report ultimately concluded placement with the mother was the best current alternative, while placement with any of the children's respective father's was not an option because none of them have had any involvement in the children's lives. A family team meeting was held the day after the adjudication hearing. A case plan subsequently filed by DHS noted the father was called several times to be invited to the meeting but he did not respond. The plan also noted a visit was set up for the father at his request, but he did not show up for it.

During the trial home placement, there were continuing concerns regarding the children's attendance at school. There were also ongoing concerns for the mother's mental health and who she was allowing to supervise the children. DHS requested the mother to undergo a mental-health evaluation early on in the case, but the mother did not do so until shortly before the termination hearing. Substance abuse also became a concern. Specifically, in December 2017, the mother was kicked out of her shelter for testing positive for marijuana. Thereafter, DHS requested the mother to submit to drug testing. The mother declined to do so until August 2018, at which time she tested positive for marijuana. Thereafter, DHS

requested the mother to submit to random drug testing, but the mother did not report to any of the random tests.

At the dispositional hearing in December 2017, the State and DHS requested that the trial home placement with the mother end and the children be placed in family foster care. The court declined to terminate the trial home placement but provided DHS could terminate the placement upon violations of the safety or permanency plans or for the children's safety. The court noted in its order that "reasonable efforts were made" and "[t]here are no requests for additional services." On January 5, 2018, DHS ended the trial home placement and placed the children in foster care after learning the mother did not follow through on facilitating the youngest child's attendance at protective daycare and the mother and children became homeless.

A permanency-review hearing was held in February, which neither parent attended. The court continued the permanency goal as reunification with the mother and granted an additional six months to work toward reunification as to the youngest child. Counsel for the mother did not request any additional services, but the father's counsel requested that DHS "follow up on the ICPC home study regarding his home." The court ordered DHS to, within ten days, "follow up on ICPC home study request by . . . father to ascertain that Iowa has done its part and to expedite the home study progress." In May, DHS filed an updated case plan in which it noted the father had not engaged in services and stated:

> This worker has been trying to obtain an ICPC home study of his home in Chicago, IL however, this has been unsuccessful. This worker no longer has a valid phone number for [the father] and the address he supplied to this worker when the case began mail is being

returned to this worker—return to sender, attempted—not known—unable to forward.

At the termination hearing, the DHS worker testified she has only had limited contact with the father, which occurred early on in the case. She testified she sent the father letters at his Illinois home every month in an attempt to communicate with him and get him involved in the case. However, in July, DHS learned from G.J.'s paternal grandmother the father was in prison in Kentucky "and is not going to be getting out anytime soon." The father testified at the termination hearing he was imprisoned on charges of fraudulent use of a credit card and tampering with evidence but he would be paroled in July 2019. The paternal grandmother asked if she could be considered a placement option for G.J. DHS initiated an ICPC home study request to Illinois as to the grandmother. The only service the father requested after the commencement of his incarceration was to have an ICPC home study conducted as to the paternal grandmother's home. He did not contact DHS to request visitation by any medium at his place of incarceration, nor did he alert the juvenile court of any concern regarding visitation.

By August 2018, DHS recommended that the permanency goal be modified to termination of parental rights. At the subsequent permanency-review hearing, the court ordered that the ICPC home study as to the paternal grandmother be completed as quickly as possible and authorized visitation between G.J. and the grandmother through electronic means. However, the court also directed the State to initiate termination proceedings. Thereafter, DHS began facilitating electronic communication between the paternal grandmother and G.J. and also initiated the ICPC process, which was eventually approved.

The mother was generally consistent in attending visitation with the children throughout most of the case, with some exceptions. Although the mother progressed from fully-supervised to semi-supervised visitation, her attendance at visitations sharply declined in the months leading up to the termination hearing. The mother had inconsistent housing and employment during and before the life of the case. The mother's dishonesty with service providers has been a major issue throughout the case. The mother made no attempt to address her substance-abuse or mental-health issues until shortly before the termination hearing. The mother did not follow through with treatment recommended as a result of her substance-abuse evaluation, nor did she meaningfully participate in mental-health treatment.

The State filed its termination petitions in September. At the termination hearing in December, the father requested termination be averted and a guardianship of G.J. be established in the paternal grandmother. The two older children have stated concern for the youngest child being placed with the grandmother in Illinois. Given the young age at which G.J. moved from Illinois with his mother, he has a limited relationship with the father and paternal grandmother. All three children are currently residing in the same foster home and have a strong bond with one another; the establishment of a guardianship in and placement with the paternal grandmother would require that the children be separated. All the children have adjusted to their foster home and are thriving in that placement. The foster parents stated their willingness to provide a "forever home" for all three children.

The juvenile court ultimately terminated the mother's parental rights to J.W. and K.W. under Iowa Code section 232.116(1)(e) (2018) and terminated both parents' parental rights to G.J. under section 232.116(1)(e) and (h). As noted, both parents appeal.

## II. Standard of Review

Appellate review of termination-of-parental-rights proceedings is de novo. *In re L.T.*, 924 N.W.2d 521, 526 (Iowa 2019). "We are not bound by the juvenile court's findings of fact, but we do give them weight, especially in assessing the credibility of witnesses." *In re A.S.*, 906 N.W.2d 467, 472 (Iowa 2018) (quoting *In re A.M.*, 843 N.W.2d 100, 110 (Iowa 2014)). Our primary consideration is the best interests of the children, *In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006), the defining elements of which are the children's safety and need for a permanent home. *In re H.S.*, 805 N.W.2d 737, 748 (Iowa 2011).

## III. Analysis

### A. Father's Appeal

On appeal, the father argues DHS failed to make reasonable efforts to facilitate reunification[3] and termination is not in G.J.'s best interests because a guardianship could have been established in the paternal grandmother.

---

[3] In his petition on appeal, the father also includes an argument concerning the sufficiency of the evidence underlying the statutory grounds for termination cited by the juvenile court. The father does not challenge the State's establishment of the statutory elements of either ground. Instead, he only challenges the sufficiency of the evidence concerning reasonable efforts. As such, we consider the sufficiency-of-the-evidence argument together with the reasonable-efforts argument.

### 1. Reasonable efforts

The father argues DHS did not make reasonable efforts to facilitate reunification because no visitation plan was established and the ICPC home study was not completed at the outset of the case. "DHS is to provide 'every reasonable effort to return the child the child's home as quickly as possible consistent with the best interests of the child.'" *L.T.*, 924 N.W.2d at 528 (quoting Iowa Code § 232.102(7)).

The juvenile court's September 27, 2017 order of adjudication noted the father's request "that [DHS] establish a visit plan between [the father] and his child." The court ordered, "The [DHS] is given discretion to determine the frequency, duration, and level of supervision as deemed appropriate." A family team meeting was held the day after the adjudication hearing, and the record shows DHS called the father several times to attend but he did not respond. The record also shows DHS set up a visitation for the father at his request shortly after the adjudication hearing, but he did not show up for it. After the adjudication hearing, the father was largely uninvolved in the proceedings. DHS continued its efforts to contact the father using the information he provided, but it was unable to get in touch with him. Neither DHS nor the juvenile court were alerted to any complaint by the father regarding the adequacy of visitation services after he requested a visitation plan at the beginning of the proceedings; the complaint was not raised until the termination hearing.

"While the State has the obligation to provide reasonable reunification services," a parent carries "the obligation to demand other, different or additional services prior to the termination hearing." *In re S.R.*, 600 N.W.2d 63, 65 (Iowa Ct.

App. 1999). After the father requested a visitation plan, the juvenile court put visitation between the father and G.J. within DHS discretion, and the father made no objections to the court concerning the inadequacy of visitation he was provided; he has consequently waived the opportunity to challenge the adequacy of visitation services on appeal. *See In re L.M.*, 904 N.W.2d 835, 840 (Iowa 2017) (concluding, where visitation was placed within discretion of DHS and the guardian ad litem, failure to voice objections at subsequent hearings concerning the adequacy of visitation waives the issue); *see also In re C.H.*, 652 N.W.2d 144, 148 (Iowa 2002) (noting complaints must be voiced to the juvenile court).

We turn to the ICPC study. In its early September 2017 removal order, the court noted, "[F]ather supports a return of the children to their mother if possible; but if that is not possible, he requests the children be placed with him [and] specifically requests an expedited" ICPC study. The court authorized DHS to conduct an ICPC study as to the father but did not expressly order that one be conducted. At the February 2018 permanency-review hearing, the father's counsel requested that DHS "follow up on the ICPC home study regarding his home." The court ordered DHS to, within ten days, "follow up on ICPC home study request by . . . father to ascertain that Iowa has done its part and to expedite the home study progress."

The father complains that the ICPC home study was not completed pursuant to these requests. Although we share the juvenile court's frustration with the failure to complete the study in a timely manner, we agree with the juvenile court that the study was not a reasonable effort required of DHS at the times they were requested. Specifically, the permanency goal at both points was reunification

with the mother, which the father stipulated to, and his initial request was for the completion of a home study in the event reunification with the mother became unattainable. As soon as the permanency goal began to veer toward termination of the mother's parental rights, the maternal grandmother was identified as a potential relative placement while the father was incarcerated, and an ICPC home study as to her home was pursued and completed by DHS. Chapter 232 provides:

> "[R]easonable efforts" means the efforts made to . . . eliminate the need for removal of the child or make it possible for the child to safely return to the family's home. Reasonable efforts shall include but are not limited to giving consideration, if appropriate, to interstate placement of a child in the permanency planning decisions involving the child and giving consideration to in-state and out-of-state placement options at a permanency hearing and when using concurrent planning. If returning the child to the family's home is not appropriate or not possible, reasonable efforts shall include the efforts made in a timely manner to finalize a permanency plan for the child. A child's health and safety shall be the paramount concern in making reasonable efforts.

Iowa Code § 232.102(12)(a). An ICPC study was not a reasonable effort necessary to return G.J. to the home with the mother, a goal the father agreed was appropriate. When the viability of that goal began to wane, DHS pursued the father's home as a potential placement. Upon our de novo review of the record, we conclude DHS met its reasonable-efforts mandate.

### 2. Guardianship

Next, the father argues termination is not in the child's best interests because a guardianship could have been established in the paternal grandmother. The father cites *In re B.T.*, 894 N.W.2d 29 (Iowa Ct. App. 2017), in support of his argument. Upon our de novo review of the record, we disagree with the father. First, simply stated, "a guardianship is not a legally preferable alternative to

termination." *A.S.*, 906 N.W.2d at 477 (quoting *B.T.*, 894 N.W.2d at 32). Next, although section 232.104(2)(d) allows for the establishment of a guardianship as a permanency option, section 232.104(3) requires "a judicial determination that [such a] planned permanent living arrangement is the best permanency plan for the child." *See B.T.*, 894 N.W.2d at 32–33. Determining the best permanency plan for a child is a best-interests assessment. In determining what is in the best interests of a child, we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2).

G.J.'s relationship with the father and paternal grandmother is limited at best given the fact that he has had very limited contact with them for most of his life. Establishing a guardianship in the paternal grandmother and placing the child in her care would separate G.J. from his two older siblings, who he shares strong bonds with. Siblings should be kept together whenever possible. *In re T.J.O.*, 527 N.W.2d 417, 420 (Iowa Ct. App. 1994). Further, the child has been in the same foster placement for most of these proceedings. The child is integrated into this home, he is thriving, and the foster parents are willing to provide a "forever home" for the child and provide continued stability and permanency. Continued stability and permanency in this home are in this child's best interests. *See* Iowa Code § 232.116(2)(b); *cf. In re M.W.*, 876 N.W.2d 212, 224–25 (2016) (concluding termination was in best interests of children where children were well-adjusted to home with their foster parents, the foster parents were "able to provide for their

physical, emotional, and financial needs," and the foster parents were prepared to adopt the children).

Upon our de novo review of the record, we find establishment of a guardianship over G.J. in the paternal grandmother is not in the child's best interests. We affirm the termination of the father's parental rights.

B.      Mother's Appeal

The mother challenges the sufficiency of the evidence underlying the grounds for termination cited by the juvenile court, argues termination is not in the children's best interests due to the parent-child bond, and maintains she should have been granted additional time to work toward reunification.

*1.      Sufficiency of the evidence*

The juvenile court terminated the mother's parental rights to all three children under Iowa Code section 232.116(1)(e) and additionally to G.J. under section 232.116(1)(h). "On appeal, we may affirm the juvenile court's termination order on any ground that we find supported by clear and convincing evidence." *In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010).

As to termination under paragraph (e), the mother only challenges the State's establishment of the final element of that provision, that she has "not maintained significant and meaningful contact with the child[ren] during the previous six consecutive months and ha[s] made no reasonable efforts to resume care of the child[ren] despite being given the opportunity to do so." Iowa Code § 232.116(1)(e)(3).

> "[S]ignificant and meaningful contact" includes but is not limited to the affirmative assumption by the parents of the duties encompassed by the role of being a parent. This affirmative duty, in addition to

financial obligations, requires continued interest in the child[ren], a genuine effort to complete the responsibilities prescribed in the case permanency plan, a genuine effort to maintain communication with the child[ren], and requires that the parents establish and maintain a place of importance in the child[ren]'s li[ves].

*Id.* While we acknowledge the mother has had contact with the children during the previous six consecutive months, such contact can hardly be described as significant and meaningful. The mother has refused to assume the duties associated with the role of being a parent. She has been given the opportunity to resume care for the children, but she has made no reasonable effort to do so. Although the mother made some progress early on, she regressed shortly thereafter, resulting in the end of the trial home placement, and there has been no progress since; matters have only gotten worse.

Upon our de novo review, we conclude the State met its burden for termination under Iowa Code section 232.116(1)(e).

### 2. *Best interests and statutory exception*

The mother argues termination is not in the children's best interests, *see id.* § 232.116(2), because termination would be detrimental to the children due to the closeness of the parental-child relationship. *See id.* § 232.116(3)(c). We choose to separately address the often-conflated best-interests and statutory-exception arguments.

As noted, in determining what is in the best interests of a child, we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." *Id.* § 232.116(2). The mother's progress in demonstrating her ability to be a responsible parent for these children

has been stagnant for some time. Before DHS intervention, she had a lengthy history with child-welfare services in Illinois based on the same concerns. "We hold no crystal ball, and to some extent, the [best-interests] determination must be made upon past conduct." *In re M.M.*, No. 16-1685, 2016 WL 7395788, at *4 (Iowa Ct. App. Dec. 21, 2016). While we hope the mother is able to prevail in her battles with depression, other mental-health issues, and substance abuse, "we cannot deprive a child of permanency after the State has proved a ground for termination" upon such sentiments. *See In re A.B.*, 815 N.W.2d 764, 777 (Iowa 2012). The mother has had ample time to get her affairs in order and learn to be a responsible parent. She has been unable to do so. These children need permanency and stability now. *See id.* at 778 ("It is simply not in the best interests of children to continue to keep them in temporary foster homes while the natural parents get their lives together." (quoting *In re C.K.*, 558 N.W.2d 170, 175 (Iowa 1997))). Finally, as noted above, the children are thriving in their current foster placement, and the foster parents are willing to provide continued stability and permanency, which is in these children's best interests. We agree with the juvenile court that termination of the mother's parental rights is in the children's best interests.

As to the statutory exception to termination cited by the mother, "The court need not terminate the relationship between the parent and child if . . . [t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship." Iowa Code § 232.116(3)(c). The application of the statutory exceptions to termination is "permissive not mandatory." *M.W.* 876 N.W.2d at 225. "[T]he parent resisting termination bears the burden to establish an exception to termination." *A.S.*, 906

N.W.2d at 476. We acknowledge the clear bond between mother and children and that the disconnect between the mother and children has caused the children trauma in the past. That being said, the record shows the children have grown accustomed to and expect the mother's inability to be a responsible parent and such conditioning has resulted in the children being less affected by the disconnect from their mother. We disagree with the mother that termination would be detrimental to the children due to the closeness of the parent-child relationship. Alternatively, we conclude the application of the permissive exception would be contrary to the children's best interests.

### 3. Extension

Finally, the mother argues she should have been granted additional time to work toward reunification. If, following a termination hearing, the court does not terminate parental rights but finds there is clear and convincing evidence that the child is a child in need of assistance, the court may enter an order in accordance with section 232.104(2)(b). Iowa Code § 232.117(5). Section 232.104(2)(b) affords the juvenile court the option to continue placement of a child for an additional six months if the court finds "the need for removal . . . will no longer exist at the end of the additional six-month period."

The mother was already granted an extension as to G.J., and she squandered that additional time.

> There are a number of stern realities faced by a juvenile judge in any case of this kind. Among the most important is the relentless passage of precious time. The crucial days of childhood cannot be suspended while parents experiment with ways to face up to their own problems. Neither will childhood await the wanderings of judicial process. The child will continue to grow, either in bad or unsettled

> conditions or in the improved and permanent shelter which ideally, at least, follows the conclusion of a juvenile proceeding.
>
> The law nevertheless demands a full measure of patience with troubled parents who attempt to remedy a lack of parenting skills. In view of this required patience, certain steps are prescribed when termination of the parent-child relationship is undertaken under Iowa Code chapter 232. But, beyond the parameters of chapter 232, patience with parents can soon translate into intolerable hardship for their children.

*In re A.C.*, 415 N.W.2d 609, 613 (Iowa 1987). The same reasoning controls the mother's request for an extension. Upon our de novo review of the record, we are unable to affirmatively conclude a need for removal would no longer exist after a six-month extension.

## IV.    Conclusion

We affirm the termination of both parents' parental rights.

**AFFIRMED ON BOTH APPEALS.**